AARON L. TURNER-Bar No. 207837
LAW OFFICES OF AARON L. TURNER, APC
357 W. 2nd Street, Suite 10
San Bernardino, CA 92401
Telephone: (909) 383-8480
Facsimile: (909) 383-8484
E-Mail:ALTURNERLAW@HOTMAIL.COM

**Attorneys** for Plaintiff O.C.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| O.C., an individual,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COUNTY OF RIVERSIDE, a public entity; RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, a public entity; SHERIFF CHAD BIANCO, an individual; CHRISTIAN HEIDECKER, an individual; JESSICA YELENICH, an individual; KARISMA VACA, an individual; SENTINEL OFFENDER SERVICES, LLC, a Delaware Limited Liability Company; and DOES 1 through 10, individually, jointly and severally,<br><br>　　　　　Defendants. | CASE NO.:  5:24-CV-01358<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Fourth Amendment Violation (42 U.S.C. § 1983);<br>2. Fourteenth Amendment Violation – Due Process (42 U.S.C. § 1983);<br>3. Failure to Intervene (42 U.S.C. § 1983);<br>4. Municipal Liability – Unconstitutional Policies, Customs, Practices (Monell, 42 U.S.C. § 1983);<br>5. Municipal Liability – Failure to Train (Monell, 42 U.S.C. § 1983);<br>6. Supervisory Liability (42 U.S.C. § 1983);<br>7. Negligence;<br>8. Violation of California Civil Code § 52.4 (Gender Violence);<br>9. Violation of Civil Code Section § 1708.88;<br>10. Violation of California Civil Code § 52.1 (Tom Bane Act)<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff O.C., an individual ("Plaintiff"), and alleges as follows:

Complaint as follows:

/ / /

/ / /

COMPLAINT FOR DAMAGES
1

## I.

## **INTRODUCTION**

1.      Plaintiff O.C. brings this civil rights action to vindicate her federal and state rights following the heinous abuse she experienced at the hands of Correctional Deputy Christian HEIDECKER of the Riverside County Sheriff's Department ("RCSD") while she was a participant in a RCSD house arrest program called the Riverside Alternative Sentencing Program ("RASP").

2.      Deputy HEIDECKER has been shown to be a serial predator and sexual abuser of female participants in RASP and is currently serving a sentence related thereto following his September 1, 2023 confession.  His modus operandi was to select certain women in the jail as potential RASP participants whom he would then target as his victims.

3.      Equally troubling was the RCSD's plan to cover up Deputy HEIDECKER's sexual harassment and abuse and to prevent the female victims from speaking up about it.  This plan was orchestrated and executed by RCSD Professional Standards Bureau Correctional Sergeant JESSICA YELENICH and the COUNTY's private attorney Nicole R. Roggeveen.  Pursuant to this plan, YELENICH and Roggeveen contacted Deputy HEIDECKER's victims and offered each money in exchange for waiving their right to sue the COUNTY and the RCSD for the sexual harassment and abuse they endured.

## II.

## **JURISDICTION AND VENUE**

4.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourteenth Amendment to the United States Constitution, and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

5.      Venue is proper within the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside within this district and the events and omissions giving rise to Plaintiff's claims occurred within this district.

///

///

## III.

## PENDANT CLAIMS

6.     On December 27, 2023, O.C. submitted a government claim to the Riverside County Clerk of the Board of Supervisors, Claims Division.  The government claim was rejected by the County of Riverside on January 8, 2024. As such, Plaintiff has complied with the California Tort Claims Act requirements with respect to their claims arising under state law. Nevertheless, Government Code section 945.9, "[a] claim arising out of an alleged sexual assault by a law enforcement officer if the alleged assault occurred while the officer was employed by a law enforcement agency is exempted from all state and local government claim presentation requirements."

7.     With respect to these supplemental state claims, Plaintiff requests that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over such claims as they arise from the same facts and circumstances which underlie the federal claims.

## IV.

## PARTIES

8.     Plaintiff O.C. was, at all times relevant hereto, a resident of the County of Riverside, California, and was a female participant of the RCSD RASP.  Plaintiff brings her claims individually pursuant to 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law and California law.  Plaintiff also brings these claims as a Private Attorney General, to vindicate not only her rights, but others' civil rights of great importance.

9.     Defendant COUNTY OF RIVERSIDE ("COUNTY") owns, operates, manages, directs and controls Defendant RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, also a separate public entity, which employs other Doe Defendants in this action.  At all times relevant to the facts alleged herein, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of its employees, including RCSD employees, complied with the laws and the Constitutions of the United States and of the State of California. Defendant COUNTY, through RCSD, is and was responsible for ensuring the protection and safety of all persons in the custody of the RCSD, including female detainees who

participated in RASP.

10.    Defendant CHAD BIANCO (hereinafter also "SHERIFF BIANCO"), at all times mentioned herein, is and, since November 6, 2018, has been the Sheriff-Coroner of Defendant COUNTY OF RIVERSIDE, the highest position in the COUNTY Jails. As Sheriff, Defendant BIANCO is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all RCSD employees and/or agents. Defendant SHERIFF BIANCO is and was charged by law with oversight and administration of the RCSD, and all corrections programs, including ensuring the safety and protection of female detainees who participated in RASP. Defendant SHERIFF BIANCO also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the RCSD RASP alleged herein were committed. Defendant SHERIFF BIANCO is being sued in his individual and official capacities.

11.    Defendant CHRISTIAN HEIDECKER ("HEIDECKER"), at all times mentioned herein, was employed by Defendant COUNTY as a correctional deputy at the RCSD and was acting within the course and scope of that employment.  At all times mentioned herein, Defendant HEIDECKER was assigned to work as a case manager for RASP where he was responsible for carrying out RCSD policies and procedures and for ensuring the protection and safety of the female detainees assigned to him.  HEIDECKER is sued in his individual capacity for damages. At all times relevant hereto, HEIDECKER was acting under the color of law.

12.    Defendant JESSICA YELENICH (hereinafter also "YELENICH"), at all times mentioned herein, was employed by Defendant COUNTY as the Correctional Sergeant for the RCSD Professional Standards Bureau, and was acting within the course and scope of that employment. At all times mentioned herein, Defendant YELENICH was responsible for carrying out RCSD policies and procedures and for ensuring the protection and safety of all inmates in the custody of the RCSD, including the RASP female detainees. The present defendant is sued in his individual capacity for damages. At all times relevant hereto, the present defendant was acting under the color of law.

13.    Defendant SENTINEL OFFENDER SERVICES, LLC (hereinafter also

"SENTINEL") is a Delaware limited liability company licensed to and doing business in the State of California, County of Riverside as a contracted provider of electronic monitoring devices, including radio frequency equipment (e.g., ankle monitors), global positioning system ("GPS") devices and cellular devices, to the COUNTY and RCSD. At all times relevant to the facts alleged herein, Defendant SENTINEL was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of its employees complied with the laws and the Constitutions of the United States and of the State of California. Defendant SENTINEL is and was responsible for ensuring the protection and safety of all persons in the custody of the RCSD, including female detainees who participated in Riverside Alternative Sentencing Program (hereinafter also "RASP"), by ensuring that the SENTINEL electronic monitoring devices were not used as a means to violate the rights of the female detainees by the RCSD RASP correctional deputies and case managers. At all relevant times mentioned herein, Defendant SENTINEL, and its employees, agents, officers, administrators and representatives, were acting under the color of law. See *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) (*Monell* also applies to suits against private entities); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (action taken by private individuals may be "under color of state law" where there is "significant" state involvement in the action); *Melara v. Kennedy*, 541 F.2d 802, 804 (9th Cir. 1976).  In the § 1983 context, the Ninth Circuit has recognized a number of tests for identifying state action. *See Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (describing the government nexus test, the joint action test, the public function test, and the state compulsion test).

14.     Defendant KARISMA VACA (hereinafter also "VACA"), at all times mentioned herein, was employed by Defendant SENTINEL, and was acting within the course and scope of that employment. At all times mentioned herein, Defendant VACA was responsible for carrying out SENTINEL policies and procedures and for ensuring the protection and safety of all inmates in the custody of the RCSD, including the RASP female detainees. The present defendant is sued in her individual capacity for damages. At all times relevant hereto, the present Defendant was acting under the color of law.

15.     Defendants COUNTY OF RIVERSIDE, RIVERSIDE COUNTY SHERIFF'S

DEPARTMENT, SHERIFF BIANCO, HEIDECKER, and YELENICH will hereinafter be referred to as the COUNTY DEFENDANTS.

16.	Plaintiff is ignorant of the true names and capacities of Defendants DOES 1 through 10 ("DOE Defendants") and therefore sue these Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein. Plaintiff will amend the complaint to state the names and capacities of each DOE Defendant when they have been ascertained.

17.	The identities, capacities, and/or nature of involvement of the defendants sued as DOES 1 through 10 are presently unknown to Plaintiff who therefore sues these defendants by fictitious names. Plaintiff is informed, believes, and thereupon alleges that DOES 1 through 10 include individual law enforcement personnel and monitoring personnel employed by the COUNTY, RCSD, and SENTINEL, and that they were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein. Plaintiff will amend this complaint to substitute the DOE Defendants' true names and capacities when they have been ascertained. Plaintiff is informed, believes, and thereupon alleges that each DOE defendant is a resident of California. Upon information and belief, DOES 1 through 10 were and still are residents of the County of Riverside, California. DOES 1 through 10 are sued in both their individual and official capacities.

18.	At all relevant times, DOES 8 through 10 were managerial, supervisorial, training, and/or policymaking employees of Defendants COUNTY and SENTINEL. At the time of the incident, DOES 8 through 10 were acting under color of law within the course and scope of their duties as employees for the RCSD, COUNTY and/or SENTINEL. They had supervisorial authority over DOES 1-10, and the employees of the RCSD and SENTINEL. DOES 8 through 10 were acting with the complete authority and ratification of their principal, Defendants COUNTY and SENTINEL.

19.	Each of the defendants, including the DOE defendants, caused, and is responsible for, the unlawful conduct and resulting injuries suffered by Plaintiff by, among other things,

personally participating in the unlawful conduct, acting jointly, or conspiring with others who did so; by ordering, authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct; by failing to take action to prevent the unlawful conduct; by failing and refusing to initiate and maintain adequate training and supervision; by failing to enact policies to address the constitutional rights of RCSD detainees despite the obvious need for such a policy; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

20.     Plaintiff is informed and believes and thereon alleges that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged. At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiff's constitutional rights and other harm.

21.     Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendants, and each of them, acted as the agents, servants, and employees of each of the other defendants.

22.     In doing each of the acts and/or omissions alleged herein, Defendants, and each of them, acted within the course and scope of their employment.

23.     In doing each of the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under the color of law

## V.

## FACTUAL ALLEGATIONS

**A.     Overview of the Riverside Alternative Sentencing Program ("RASP")**

24.     In April 2011, the California Legislature signed into law the Public Safety Realignment Act (the "PSRA") (Assembly Bill 109) to, inter alia, reduce the prison population in

the State.

25.    In accordance with the PSRA, COUNTY implemented RASP, which allows qualifying inmates to serve their sentence outside of the county jail, either through home confinement, or while being housed at a fire camp facility supervised by the California Department of Corrections and Rehabilitation.

26.    RASP's home confinement program — the Supervised Electronic Confinement Program ("SECP") — is available to both sentenced and unsentenced inmates.  This program provides sentenced inmates with the opportunity to complete their jail sentence at home while supervised via a GPS-enabled ankle monitor.  For unsentenced inmates, this program allows qualified pretrial detainees the opportunity to be released from custody with a GPS-enabled ankle monitor, following their arraignment, as they continue their court proceedings.

27.    Inmates interested in participating in the SECP can either apply or will be selected by a team of RASP correctional deputies who review the inmate for program suitability through an in-person interview, criminal history analysis, and an in-custody behavior review.  A review of the program rules with prospective cohabitants and a residence inspection are then complete.

28.    RASP participants are assigned case managers to monitor their activities. Case managers are expected to monitor the participant's activities, verify participants remain current on home monitoring fees, address issues with monitoring equipment, update client information, and verify participants comply with the terms and conditions of the program. Case managers supervise the following: entries and exits from the residence, equipment tampering and/or malfunctions, verify the participant follows their set schedule, and verify all paperwork and personal information provided by the participant is valid and current.

29.    Defendant HEIDECKER was assigned to RASP as a case manager at the Coordinated Custody Management Unit in Banning, California.

**B.    The SECP Terms and Conditions**

30.    The SECP imposes certain conditions on inmates selected to participate in the program.  Under the SECP's Terms and Conditions, inmates must agree to, among other things, wear an electronic ankle bracelet; have access to a telephone (landline or cellphone); remain in

their residence during confinement except under specific conditions; not violate any laws; not consume or possess alcoholic beverages, illegal drugs, or narcotics; and not possess or have in the residence any gun, explosive, or other deadly weapon.

31. Participants further agree to "submit [their] person, property, residence, or vehicle to search without any warrant or probable cause, at any hour of the day or night, by the SECP staff or their designee."

32. Participants are permitted time outside of their home two days a week from 9 a.m. to 1 p.m. with additional time for work or school. Case managers have discretion to adjust a participant's free time. Additionally, scheduled free time will not be allowed beyond the maximum without a supervisor's approval.

33. Case managers, like Defendant HEIDECKER, were required to remain in contact with RASP participants and ensure compliance with RASP terms and conditions. In turn, RASP participants were required to communicate with their case managers through text message.

34. Participants agree to "comply with all terms and conditions of [their] probation, if any, and any directives issued by [their] Case Manager. Failure to abide by any of these orders may result in [their] immediate removal from the program and [their] return to custody."

35. Participants in the program are eager to avoid returning to jail, which renders them susceptible to exploitation by officers like Deputy HEIDECKER.

**C.    SENTINEL OFFENDER SERVICES Monitors RASP Participants**

36. RASP participants are monitored through a Global Positioning System (GPS) used in their ankle monitors. These systems are then monitored through Defendant SENTINEL, which has a service contract with the RCSD.

37. Defendant SENTINEL provides the RCSD with GPS devices and ankle monitors. As noted, each RASP participant is assigned a case manager, a correctional deputy who manages their case while in the program. These case managers are given SENTINEL cell phones to communicate with the RASP participants. RASP participants communicate by cell phone with their case managers.

38. Defendant KARISMA VACA was an employee with Defendant SENTINEL. She

was employed by Defendant SENTINEL and was assigned to the RASP office. She worked inside the RASP office with the other deputies, including Defendant HEIDECKER. Defendant VACA's job was to collect the work-issued phones from deputies within the RCSD who were case managers in the RASP program; this included Defendant HEIDECKER.

39.     Upon information and belief, Defendant VACA and Defendant HEIDECKER engaged in a back and forth pertaining to the collection of his SENTINEL cellular phone. Defendant HEIDECKER had texted Defendant VACA sexually explicit texts regarding having sexual relations with her. After Defendant VACA collected the phones, she feared Defendant HEIDECKER would continue to text her, which concerned her.

40.     Upon information and belief, Defendant HEIDECKER maintained a romantic and sexual relationship with Defendant VACA. Defendant HEIDECKER was utilizing his romantic and sexual relations with Defendant VACA to continue to manipulate RASP participants. Certainly, had Defendant VACA not engaged in romantic and sexual relations with Defendant VACA, there would be less victims of Defendant HEIDECKER. The grooming of O.C. and others could have been stopped at the outset had there been no complacency by employees at SENTINEL, including Defendant VACA. Indeed, more supervision by employees could have prevented this abuse. Nevertheless, Defendant HEIDECKER used his position of power to continue his advances and abuse, and utilized his relationship with Defendant VACA, a SENTINEL employee, to continue doing so.

**D.     Deputy HEIDECKER Targets Female RASP Participants**

41.     Deputy HEIDECKER used his position of power to target vulnerable female RASP participants in furtherance of his sexual desires.  He exploited these women's fear of returning to jail and/or criminal consequences by forcing them to comply with his sexual requests and/or abuse.  As has become clear, he engaged in a similar pattern with multiple women, including those who are assigned other RCSD case managers.

42.     His tactics followed a familiar pattern.  Defendant HEIDECKER typically selected his targets while they were still housed at the jail.  Often, he would be assigned as their case manager, but, as was the case here, sometimes he targeted them even when he was not a case

manager, explaining that he was "filling in" for someone else.

43.    Once they arrived at their homes on house arrest, Defendant HEIDECKER would contact them on his work cellphone that was provided by Defendant SENTINEL.

44.    After initiating contact, Defendant HEIDECKER would ask the women to send him photos that were framed as per their agreed to terms and conditions. Sometimes it was because he needed to "see their ankle monitor," or other times he asked for photos of their face to "update their pictures on file."

45.    Once the female RASP participants complied with his requests, Defendant HEIDECKER would praise the photos he received, complimenting the RASP participants' physical appearance, including their feet. He would remind them of their newly found freedom with comments like "it must be good to be home" and "this program is a privilege." By utilizing terms of endearment, and reminding participants how lucky they should feel, he aimed to make these women feel seen, to make sure he had power over them soon enough.

46.    After the women were thankful for his compliments, Defendant HEIDECKER would ask for more photos, or continue speaking about their appearance, and his attraction to them.  Every time, Deputy HEIDECKER would initiate the flirtatious conversations and then convince the women to text him on his personal phone.

47.    Defendant HEIDECKER would then establish "ground rules" with RASP participants as soon as these conversations moved to his personal phone. Many of the ground rules established by Defendant HEIDECKER were either illegal or not terms or conditions part of RASP, merely rules enacted by Defendant HEIDECKER to conceal his sexual criminal scheme.

48.    One of Defendant HEIDECKER's ground rules was a rule to delete messages between Defendant HEIDECKER and a RASP participant. For example, if this ground rule was not followed, Defendant HEIDECKER threatened consequences including to send a sheriff deputy to the home of the RASP participant to ensure that the messaged were deleted.

49.    Defendant HEIDECKER aimed to build rapport with RASP participants by sharing personal information in order to humanize himself and make RASP participants feel guilty about any desire to report him.

COMPLAINT FOR DAMAGES
11

50.    Defendant HEIDECKER established his dominance by sending multiple texts to RASP participants if they did not respond for a short period of time. He would also utilize guilt to make RASP participants feel regretful if they neglected the conversation that was often one-sided.

51.    Defendant HEIDECKER used his position of power to coerce female RASP participants to submit to his sexual advances. Because these women were vulnerable and had a loss of control at this point, they were forced to comply with Defendant HEIDECKER's requests out of fear of retaliation and being taken off the program for not following the directives of her case manager.

52.    Once Defendant HEIDECKER was able to establish his dominance and control, Defendant HEIDECKER subjected RASP women participants to sexual abuse in the following forms:

a.    Transmitting unwanted sexual messages;

b.    Demanding sexual images;

c.    Demanding nude images;

d.    Demanding that women RASP participants to engage in sexual acts;

e.    Demanding that women RASP participants record themselves engaging in sexual acts;

f.    Demanding that women RASP participants send Defendant HEIDECKER images of themselves engaging in sexual acts;

g.    Transmitting sexual images of Defendant HEIDECKER to women RASP participants;

h.    Transmitting recordings of Defendant HEIDECKER engaging in sexual acts to women RASP participants;

53.    Defendant HEIDECKER's messages were unsolicited and RASP participants did not consent to any of Defendant HEIDECKER's sexual advances including the transmission of sexual images. However, women RASP participants complied with Defendant HEIDECKER's under threat. Defendant HEIDECKER would threaten RASP participants with the following consequences if his sexual requests were not followed:

a.  Arrest and confinement to jail;

b.  Imposition of additional criminal charges against the RASP participant;

c.  More restrictive hours meaning that RASP participants would be confined at home for longer hours including threats of "lockdown for the rest of the day";

d.  More restrictive curfew hours meaning that RASP participants have to arrive home earlier;

e.  Termination of the RASP participant's enrollment in RASP which would lead to a return to custody.

54.  Consequently, given that women RASP participants were threatened with many threats including jail, women RASP participants, including Plaintiff, had no option but to comply with Defendant HEIDECKER's illegal and sexual demands.

55.  Central to Defendant HEIDECKER's sexual criminal scheme of the threat to RASP participants was going back to jail. Defendant HEIDECKER made it clear that if his demands were not met, Defendant HEIDECKER had the power to send RASP participants to jail.

56.  Defendant HEIDECKER admitted to these conversations with RASP participants, and that he did in fact move conversations from his SENTINEL phone to his personal phone. Defendant HEIDECKER justified doing so due to the flirtatious nature of the messages. In reference to the messages sent, Defendant HEIDECKER admitted to having a foot fetish and asking RASP participants for images of their ankle monitors in order to see their feet in the photo. Additionally, Defendant HEIDECKER admitted to enhancing hours in the program and performing other favors in exchange for sexual photos of the participants.

57.  Many of the RASP participants subjected to Defendant HEIDECKER's sexual criminal scheme have families, including children of their own, so the threat of going to jail was severe. All the RASP participants subject to Defendant HEIDECKER's sexual criminal scheme were desperate to stay out of jail.

**E.    Defendant HEIDECKER Targets O.C.**

58.  On or about July 24, 2023, O.C. was placed in RASP while incarcerated in the

Riverside County Sheriff's Department – Larry D. Smith Correctional Facility located at 1627 S. Hargrave Avenue, Banning, CA 92220.

59.   When O.C. signed up for home monitoring while still incarcerated, Deputy HEIDECKER approached her at the jail even though she was being assisted by another deputy, and asked questions about her children, who she lived with, and if she lived alone.  Not only did she tell him that she lived alone, but she was also required to give this information when she was signing up for home monitoring, rendering her vulnerable to, and at the mercy of, RCSD deputies. Deputy HEIDECKER also went into her file to obtain her cell phone number.

60.   It should be noted that Deputy HEIDECKER was *not* assigned as O.C.'s case manager.  Nonetheless, Deputy HEIDECKER repeatedly asserted his authority over O.C.

61.   On July 24, 2023, within two hours of being placed on house arrest and after she arrived home, Deputy HEIDECKER texted O.C. from his department-issued cellular telephone.

He indicated that an alert was made suggesting that O.C.'s GPS monitor was tampered with and asked O.C. to take a picture of the monitor, "Front, back, side and side."

62.   After O.C. sent a picture, Deputy HEIDECKER complimented O.C.'s tattoo and stated, "I know Deputy Arrelano is your case manager but if you need anything hit my line up and I'll try to help you out without overstepping Arrellano."

63.   During this text conversation, Deputy HEIDECKER admitted that he targeted O.C., stating, "Well I saw you [at the jail] and was instantly like wow this girl is so pretty, you stayed respectful and then that's why I asked you your charges. And got to interact with you a bit and feel you out."

64.   Deputy HEIDECKER then asked O.C. for a selfie for her profile despite the fact that RCSD already had in its possession O.C.'s booking photo. Deputy HEIDECKER then told O.C., "Of course, I don't do this for most so don't screw me on this lol. Lol [a] regular photo is fine haha. But uhhh shit, you can sent [*sic*] a few and I'll pick the best."

65.   After O.C. sent a picture of herself, Deputy HEIDECKER responded back on the department-issued cellular telephone, stating, "You're going to get me fired. My goodness."  This was followed by eyeball and fire/flame emojis.  He further said, "Your [*sic*] man is one lucky

man.  And I wish we could talk on my personal because damn lol haha."

66.    Deputy HEIDECKER then requested that he be allowed to contact O.C. on his personal cellphone, writing, "I just don't want to get in trouble or anything like that.  I've never done this before lol and I got two daughters and if anything were to happen to my job it would be so bad.  But man oh man I would love to hit your line on my personal lol."

67.    Within one hour of first contacting O.C. under the guise of a purported tamper alert, Deputy HEIDECKER texted O.C. from his personal cellphone and made several inappropriate and sexual comments.  He asked O.C. for more pictures for his own phone, told her that he had some of his own sexual pictures that he wanted to send her, and asked if she could send him the same.  O.C. told him not to send the photos.

68.    Deputy HEIDECKER then asked O.C. to send another picture of her GPS monitor and said that the image had to include her entire feet and toes.  Deputy HEIDECKER went on to ask O.C. if she found him attractive and then sent O.C. pictures of himself lifting weights and a fully nude photo of himself.  Deputy HEIDECKER continued to ask for inappropriate and nude photos.  O.C. opted instead to send Deputy HEIDECKER non-nude, non-explicit photos.

69.    Deputy HEIDECKER texted O.C. that she looked like his kid's future stepmom while continuing to send pictures of himself.   Deputy HEIDECKER also continued to ask O.C. for pictures of her breasts and other sexually explicit pictures.  When O.C. informed Deputy HEIDECKER that she did not feel comfortable sending him such pictures, he responded by stating, "What's the closest you're willing to show?" Deputy HEIDECKER went on to say, "And I do want you to know that you can trust me.  I'm not here to hurt you or make your life harder."

70.    After O.C. again expressed that she was not comfortable with sending any inappropriate pictures to him, Deputy HEIDECKER responded, "Ugh I know.  That's my bad lol. Well if you're cool with it you can send me anything.  I just want more of you."  He then stated that he did want to send her something if she sent something "naughty" and that, "I'm sorry for asking lol. I'm sure this is just too much info but I'm horny af and I want you so freaking bad Hahahha.  But I'll behave." He further indicated that he wanted to be "all over" O.C.'s breasts.

71.    Deputy HEIDECKER then inappropriately and in violation of O.C.'s civil rights,

sent O.C. two (2) full clear videos of himself masturbating, showing his entire face and his penis, and told O.C., "Here you go babe.  In case you're horny tonight."  O.C. did not respond to this text.

72.    This interaction between Deputy HEIDECKER and O.C. occurred within hours of O.C.'s release on home monitoring and while in custody of the RCSD.

73.    The following day — on July 25, 2023 — Deputy HEIDECKER chastised O.C. for not responding sooner to his masturbation videos.  He then exhibited his authority over O.C. by indicating that he could protect her while she reported to him during her house arrest.  He told O.C., "I can only help you and protect you so much."  He further stated that, "…I got you and will try to protect you and make you successful on the program but you gotta 1. Help your own self out and 2. Help me help you out." He then included a winking emoji and a purple devil emoji.

74.    O.C. responded, "Gotcha! But I'm curious in what ways you'd be able to help because isn't everything like super documented."  Deputy HEIDECKER said, "Don't you worry about it. Lol just know I gotchu lol. Are we good tho babe ?"

75.    Later that day, Deputy HEIDECKER asked O.C. if she masturbated to his videos, stating, "Mmmm did you cum good?? Do you have toys or did you use your fingers."  He went on to ask O.C. for more pictures because "I lowkey wanna cum to you so fucking bad."  Deputy HEIDECKER then asked O.C. if she has vibrators or dildos and if she does anal sex.  In response, O.C. reminded Deputy HEIDECKER that she asked him not to send any explicit messages.

76.    Undeterred by O.C.'s repeated requests that he stop sending explicit messages, Deputy HEIDECKER told O.C. that he wanted to get to know her and everything about her, stating that, with his work and custody schedule, it was hard for him to meet women and go on dates.  He said that anything that they did together needed to be planned and of brief duration. Deputy HEIDECKER then said that he wanted to see "all of" O.C. and that he "loved eating ass and that fucking ass is always fun."  Deputy HEIDECKER then offered to adjust O.C.'s home monitoring hours.  O.C. did not respond and stopped responding to Deputy HEIDECKER's messages.

77.    Deputy HEIDECKER continued his unwelcome contact with O.C. on his personal cellphone for multiple days in July and August 2023.  When O.C. would not respond to his text messages, Deputy HEIDECKER made statements knowing that he had violated her rights and wanted to make sure that she would not do anything to make it "weird" at his work.

78.    On July 27, 2023, at approximately 8:27 a.m., Deputy HEIDECKER contacted O.C. from a new telephone number and told her that she needed to take the BART test.  Deputy HEIDECKER then contacted O.C. on his personal phone at 9:29 a.m. after he noticed that his advances were not welcomed by O.C. and stated, "Hey what's up.  So I can get the hint you don't wanna talk which I'm cool with and understand completely. I just wanna make sure we are good?"  Six hours later at 3:37 p.m., Deputy HEIDECKER texted O.C., "?.  Imma leave you alone.  I get the hint and I am not trying to blow you up I just am making sure we are good is all."  After another 6 hours on that same day at 9:54 p.m., Deputy HEIDECKER contacted O.C. again, stating, "Hey! So once again, I don't wanna bother you or make things worse lol but all I wanna know is if we are good.  You've been ignoring me and I don't want things to be awkward with work and your situation.  So plz just let me know what's up."

79.    At another point during that same day and after O.C. continued to not respond to Deputy HEIDECKER on his personal cell phone, he contacted her using his work cellphone and asked if she wanted him to adjust her hours on the weekend.  O.C. declined.

80.    On August 14, 2023, Deputy HEIDECKER texted O.C. to say good morning, and he sent a picture of himself.  O.C. did not respond to this message.

81.    On August 28, 2023, Deputy HEIDECKER continued to text O.C.  O.C. did not respond to this message, either.

82.    When O.C. appeared at Smith Correctional Facility to have her GPS monitor removed on or about August 28, 2023, Deputy HEIDECKER arranged it so that he would be the one to remove the monitor.  This interaction occurred in a private room with just Deputy HEIDECKER and O.C. present.  O.C. felt disgusted and unsafe as Deputy HEIDECKER touched her feet and proceeded to remove the GPS monitor.

///

**F.    Deputy HEIDECKER is Arrested and Sentenced**

83.    On September 1, 2023, an Investigator with the RCSD contacted Defendant HEIDECKER at his home. In a voluntary statement, Defendant HEIDECKER admitted to having abusive conversations with RASP participants, acknowledged his sexual motivations in doing so, including his foot fetish, and admitted to enhancing hours in the program and conducting "favors" in exchange for photos from the RASP participants.

84.    Defendant HEIDECKER was arrested on September 15, 2023, and charged with eighteen (18) felony counts for engaging in a sexual act without consent as a detention officer; forced sexual penetration; extortion; dissuading a witness; and bribery.

85.    On February 26, 2024, Defendant HEIDECKER pled guilty to five (5) counts of extortion, four (4) counts of witness intimidation, and four (4) counts of bribery.

86.    Defendant HEIDECKER was sentenced to five years in prison.

**G.    The COUNTY and RCSD Orchestrate a Plan to Silence Deputy HEIDECKER's Victims By Offering Hush Money in Exchange for Waivers to Sue**

87.    After Deputy HEIDECKER confessed on September 1, 2023 to sexually abusing numerous female detainees who were in his direct control and custody through RASP, he agreed to turn himself in on September 15, 2023 at the request of the COUNTY and RCSD.

88.    During this 15-day gap, the COUNTY and RCSD executed a plan to cover up the sexual abuse and to prevent the public from hearing the victims' accounts of what Defendant HEIDECKER did to them. This plan was orchestrated and executed by RCSD Professional Standards Bureau Correctional Sergeant JESSICA YELENICH and the COUNTY's private attorney Nicole R. Roggeveen.

89.    Defendant YELENICH and Attorney Roggeveen created a list of HEIDECKER's victims and offered almost all of them money in exchange for waiving their right to sue the COUNTY and the RCSD for the sexual harassment and abuse they were forced to endure.

90.    Plaintiff O.C. was never offered any money.  Plaintiff O.C., out of fear that she would be threatened and intimidated and even incarcerated, chose to wait until after she was off

of ankle monitoring and until she represented by a lawyer to file a complaint against Defendant HEIDECKER.  Based on what has been shown thus far, with the offers to other victims time keep silent and to waive their right to the COUNTY and other intimidating acts and tactics of the COUNTY and RCSD, she was correct in her thoughts.

**H.      The Impact of Deputy HEIDECKER's Unwelcome Contact**

91.      In fear for her safety and as a result of the conduct of all Defendants involved, O.C. has not been able to eat, has had anxiety, depression, nervousness, has not been able to get a complete night's sleep, and has suffered severe and extreme emotional distress.  She is constantly on edge and has become withdrawn from her family.  Her health has declined and she has suffered constant headaches since Deputy HEIDECKER's conduct began.

92.      O.C.'s mental condition deteriorated so much that she attended weekly therapy sessions for months to help deal with the trauma.  O.C. has since moved to another state in order to get as far away from Deputy HEIDECKER as possible.

93.      It was because of this fear for her safety that O.C. chose to wait until she had completed the monitoring program to file a formal complaint with the RCSD.  O.C. was extremely afraid that Deputy HEIDECKER would retaliate against her by causing her harm and/or sending her back to jail if she came forward with this information earlier.

94.      O.C. felt that that she could not rebuff Deputy HEIDECKER's inappropriate sexual advances and felt that if she did, harm would occur to her because of his position of authority, particularly since Deputy HEIDECKER knew that O.C. lived alone.

95.      It is apparent that O.C.'s state and federal rights were violated.  O.C. was harassed and subjected to extreme and outrageous conduct.  The conduct of Deputy HEIDECKER and the RCSD has subjected O.C. to the injuries noted above, which she continues to suffer to this day. O.C.'s injuries are continuing and on-going.

96.      Furthermore, since her interactions with Deputy HEIDECKER, O.C. has developed an extreme fear of law enforcement.

**I.      RCSD and COUNTY Knew of Deputy HEIDECKER's Sexual Deviancy**

97.      Well before Defendant HEIDECKER executed his criminal sexual scheme, he

starred in a disturbing video recorded at a RCSD jail. The video was entitled "Big Dick Deputies" and Defendant HEIDECKER is clearly identified in the Big Dick Deputies video. See Screenshots Below.

 

98.    Not only did Defendant HEIDECKER brazenly star in a video entitled "Big Dick Deputies," Defendant HEIDECKER recorded and starred in such video in a RCSD jail while in his RCSD uniform.

99.    Upon information and belief, Defendants COUNTY and RCSD were aware of Defendant HEIDECKER starring in the "Big Dick Deputies" video yet failed to take any actions to remediate or address Defendant HEIDECKER's involvement in the video.

100.    Given that Defendants COUNTY and RCSD were well aware of the "Big Dick Deputies" video and failed to address Deputy HEIDECKER's involvement, it was foreseeable that Deputy HEIDECKER's conduct would escalate as reflected in his criminal sexual scheme with RASP participants.

101.    Based on information and belief, Deputy HEIDECKER's superiors and supervisors at the Riverside County Sheriff's Department knew, or should have known, of Deputy HEIDECKER's behavior with RASP participants.

102.    Based on information and belief, the RCSD, with full knowledge of the

inappropriate conduct of Deputy HEIDECKER, approved and ratified the conduct of Deputy HEIDECKER and failed to discipline and/or terminate him from his position with the RCSD with full knowledge of his illegal conduct and propensities.

## VI.

## FIRST CLAIM FOR RELIEF

### Fourth Amendment Violation

### (42 U.S.C. § 1983)

### Against Defendants CHRISTIAN HEIDECKER and DOES 1 through 5

103.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

104.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Torres v. Madrid*, 592 U.S. 306, 311 (2021). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A seizure for the purposes of the Fourth Amendment "requires either physical force ... or, where that is absent, submission to the assertion of authority." *Torres v. Madrid*, 592 U.S. 306, 311 (2021). An officer has made a "show of authority" when an officer's words and actions would convey to a reasonable person "that he was being ordered to restrict his movement." *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

105.    "Beyond the specific proscription of excessive force, the Fourth Amendment generally proscribes "unreasonable intrusions on one's bodily integrity,' . . . . and other harassing and abusive behavior that rises to the level of 'unreasonable seizure.'" *Fontana v. Haskin*, 262 F.3d 871, 878–79 (9th Cir. 2001) (determining that police officer's "sexual verbal and physical predation against a handcuffed arrestee" on ride to police station violated Fourth Amendment) (citations omitted). The Fourth Amendment bars intrusion into the body "which are not justified in the circumstances, or which are made in an improper manner." *Schmerber v. California*, 384

U.S. 757, 768 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State").

106.    As alleged above, HEIDECKER, while acting under color of law, submitted Plaintiff to his authority as a RCSD deputy. Indeed, HEIDECKER's entire scheme was predicated on wielding his authority in order to have Plaintiff submit to his sexual demands. It was clear to Plaintiff that HEIDECKER's commands and orders restricted her movement in violation of Plaintiff's Fourth Amendment rights.

107.    Furthermore, HEIDECKER's conduct also constituted an unreasonable intrusion on Plaintiff's bodily integrity in further violation of Plaintiff's Fourth Amendment rights. In fact, HEIDECKER's intrusion into Plaintiff's body by positioning himself such that he would be the one removing her ankle monitor and thus touching her feet for his own sexual impulses was not justified under any circumstance. Clearly, HEIDECKER's intrusion into Plaintiff's body was made for the improper manner to satisfy his insatiable sexual impulses.

108.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages.

109.    The conduct of HEIDECKER entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law.  Plaintiff does not seek punitive damages against Defendants COUNTY and RCSD.

110.    Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**SECOND CLAIM FOR RELIEF**

**Fourteenth Amendment Violation – Substantive Due Process**

**(42 U.S.C. § 1983)**

**Against Defendants CHRISTIAN HEIDECKER and DOES 1 through 5**

111.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

112.    The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person

COMPLAINT FOR DAMAGES
22

of life, liberty, or property, without due process of law. . ." U.S. Const., Amdt. 14, § 1. The Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

113.    Under the Fourteenth Amendment's substantive due process prong, courts use the "shocks the conscience" test to determine if a violation has occurred. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The threshold question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. at 848 n. 8. Sexual predation can be "unjustifiable by any government interest." *Fontana v. Haskin*, 262 F.3d 871, 882 n. 7 (9th Cir. 2001). Sexual predation can be an "arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)).

114.    At all relevant times, HEIDECKER was acting under color of law.

115.    As alleged above, HEIDECKER groomed, preyed upon, and sexually exploited Plaintiff with the underlying threat of a return to imprisonment if Plaintiff did not comply with HEIDECKER's sexual demands.

116.    Indeed, HEIDECKER arbitrarily abused his power as a RCSD sheriff deputy by exploiting and victimizing Plaintiff in order to satisfy his sexual predation. HEIDECKER sexually preyed upon Plaintiff and took advantage of Plaintiff's vulnerabilities.

117.    HEIDECKER's conduct clearly shocks the conscience in violation of Plaintiff's Fourteenth Amendment rights.

118.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff herein sustained injuries and damages.

119.    The conduct of HEIDECKER entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY and RCSD.

120.    Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. §

1988, and other applicable United States and California codes and laws.

## THIRD CLAIM FOR RELIEF

### Failure to Intervene

### (42 USC § 1983)

### Against Defendants KARISMA VACA and DOES 1 through 5

121.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

122.    This claim for relief is brought against Defendants KARISMA VACA and RCSD Doe Deputies. While Defendant KARISMA VACA is not a RCSD law enforcement officer, Defendant KARISMA VACA was acting under color of law. Action taken by private individuals may be "under color of state law" where there is "significant" state involvement in the action. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); Melara v. Kennedy, 541 F.2d 802, 804 (9th Cir.1976). In the § 1983 context, the Ninth Circuit has recognized a number of tests for identifying state action. *See Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983) (describing the compulsion test).

123.    The Ninth Circuit has clearly held that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citing *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir.1994), rev'd on other grounds, 518 U.S. 81 (1996)). "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham*, 229 F.3d 1289. "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *Koon*, supra,34 F.3d at 1447 n. 25.

124.    Defendants KARISMA VACA and RCSD Doe Deputies failed to intervene or intercede when they were made aware that HEIDECKER was exploiting, abusing, and taking advantage of RASP participants.

125.    Upon information and belief, Defendant KARISMA VACA knew the intimate details of HEIDECKER's criminal sexual scheme not only because she was the SENTINEL

employee responsible for monitoring but also because Defendant KARISMA VACA was having a sexual relationship with HEIDECKER.

126. Furthermore, given that HEIDECKER was a "Big Dick Deputy" and brazenly, without fear of discipline or retribution, carried out his criminal sexual scheme, Plaintiff is informed and believes that other RCSD deputies were aware of HEIDECKER's criminal conduct but failed to intervene or intercede in Plaintiff's constitutional violations.

127. As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff herein sustained injuries and damages.

128. Accordingly, Defendants KARISMA VACA and RCSD Doe Deputies are equally liable for HEIDECKER's violations.

129. The conduct of Defendant KARISMA VACA and RCSD Doe Deputies entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY and RCSD.

130. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

## FOURTH CLAIM FOR RELIEF

**Municipal Liability – Unconstitutional Policies, Customs, Practices**

**(Monell, 42 U.S.C. § 1983)**

**Against Defendants RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, COUNTY OF RIVERSIDE, SENTINEL, and DOES 6 through 10**

131. Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

132. As set forth in the forgoing claims for relief, HEIDECKER and DOES 1-5, inclusive, and each of them, committed clear and well-established violations of constitutional rights against Plaintiff O.C. within the course and scope of his employment as RCSD deputies, under color of law.

133. On and for some time prior to July of 2023 (and continuing to the present date),

Defendants COUNTY, RCSD and DOES 6-10, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Plaintiff, and of persons in her class, situation and comparable position in particular, knowingly maintained, enforced and applied an official recognized custom, policy, and practice of:

      a.    Permitting sheriff deputies, including HEIDECKER, to contact RASP participants while on duty for non-law enforcement purposes;

      b.    Permitting sheriff deputies, including HEIDECKER, to sexually groom RASP participants;

      c.    Permitting sheriff deputies, including HEIDECKER, to sexually prey upon RASP participants;

      d.    Permitting sheriff deputies, including HEIDECKER, to sexually exploit RASP participants;

      e.    Permitting sheriff deputies, including HEIDECKER, to take advantage of RASP participants for sexual purposes;

      f.    Permitting male sheriff deputies, including HEIDECKER, oversee female RASP participants;

      g.    Permitting sheriff deputies, including HEIDECKER, to use their personal cell phones to communicate with RASP participants;

      h.    Permitting sheriff deputies, including HEIDECKER, to engage in sexually improper conduct while on duty such as making a video entitled "Big Dick Deputies";

      i.    Carrying out "cover ups" or plans to conceal misconduct by sheriff deputies, including the misconduct of HEIDECKER;

      j.    Encouraging and ratifying cover ups by members of the professional standards bureau, including Defendant JESSICA YELENICH;

      k.    Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to pay sexual abuse victims "hush money" or insulting and demeaning sums of money in exchange for their

silence concerning sheriff deputy misconduct;

l.      Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to file tort claims on behalf of sexual abuse victims to further ensure their silence concerning sheriff deputy misconduct.

134.    The expressly adopted policies and/or widespread, well-known, and longstanding customs or practices set forth above, constitute standard operating procedures within the Defendants COUNTY and RCSD, which have directly precipitated the pervasive sexual abuse/assault against innocent members of the general public at an unignorable and unacceptable scale, not least of which resemble the egregious constitutional violations suffered by O.C.

135.    Defendants COUNTY and RCSD, and individual supervisory officials thereof, whether named or unnamed, had either actual or constructive knowledge of the unconstitutional policies, practices, and/or customs set forth herein. Despite this knowledge, the Defendants COUNTY and RCSD, by and through officials with final policymaking authority, did condone, tolerate, and ratify such policies, customs, and practices, and have shown deliberate indifference to the foreseeable effects and consequences of these policies, customs, and practices with respect to the civil rights and wellbeing of the present Plaintiff, other individuals similarly situated, and the general public.

136.    The vile sexual exploitation and abuse of Plaintiff O.C. due to the conduct of HEIDECKER and DOES 1-5, inclusive, caused O.C. to have significant psychological injuries. As a direct consequence of these injuries, Plaintiff suffered and continues to suffer severe mental, and emotional anguish, as well as extensive hardship.

137.    Furthermore, Plaintiff also alleges that Defendants SENTINEL and DOES 6-10 is liable under municipal liability. In *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012), the Ninth Circuit held that Monell also applies to suits against private entities.

138.    On and for some time prior to July of 2023 (and continuing to the present date), Defendants SENTINEL and DOES 6-10, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Plaintiff, and of

persons in her class, situation and comparable recognized custom, policy, and practice of:

    a.    Permitting employees, including Defendant VACA, to ignore improper communications on SENTINEL cellular phones;

    b.    Permitting employees, including Defendant VACA, to ignore sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

    c.    Permitting employees, including Defendant VACA, to fail to report improper communications on SENTINEL cellular phones;

    d.    Permitting employees, including Defendant VACA, to fail to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

    e.    Permitting employees, including Defendant VACA, to have romantic relations with RCSD deputies;

    f.    Permitting employees, including Defendant VACA, to have sexual relations with RCSD deputies;

139. The expressly adopted policies and/or widespread, well-known, and longstanding customs or practices set forth above, constitute standard operating procedures within the Defendants SENTINEL and DOES 6-10, which have directly precipitated the pervasive sexual abuse/assault against innocent members of the general public at an unignorable and unacceptable scale, not least of which resemble the egregious constitutional violations suffered by O.C.

140. Defendants SENTINEL and DOES 6-10, and individual supervisory officials thereof, whether named or unnamed, had either actual or constructive knowledge of the unconstitutional policies, practices, and/or customs set forth herein. Despite this knowledge, the Defendants SENTINEL and DOES 6-10, by and through officials with final policymaking authority, did condone, tolerate, and ratify such policies, customs, and practices, and have shown deliberate indifference to the respect to the civil rights and wellbeing of the present Plaintiff, other individuals similarly situated, and the general public.

141. The vile sexual exploitation and abuse of Plaintiff O.C. due to the conduct of

Defendants VACA and DOES 1-5, inclusive, caused O.C. to have significant psychological injuries. As a direct consequence of these injuries, Plaintiff suffered and continues to suffer severe mental, and emotional anguish, as well as extensive hardship.

142.   Accordingly, the policies, practices, and/or customs implemented, maintained, or still tolerated by Defendants COUNTY, RCSD, SENTINEL, or final policymakers thereof, are so inextricably connected to the unconstitutional conduct that Plaintiff O.C. has endured as to be a substantial moving force behind it.

143.   Clearly, Defendants COUNTY, RCSD, SENTINEL's unconstitutional customs and practices was the moving force which caused Plaintiff's injuries. Therefore, Defendants COUNTY, RCSD, SENTINEL must be regarded as similarly liable for all claims raised herein against its employees, agents, and/or representatives under 42 U.S.C. § 1983.

144.   As a direct and proximate result of Defendants COUNTY, RCSD, SENTINEL's acts and/or omissions as set forth above, Plaintiff herein sustained injuries and damages.

145.   Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws

**FIFTH CLAIM FOR RELIEF**

**Municipal Liability – Failure to Train**

**(Monell, 42 U.S.C. § 1983)**

**Against Defendants RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, COUNTY OF RIVERSIDE, SENTINEL, and DOES 6 through 10**

146.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

147.   As set forth in the herein, Defendants HEIDECKER, VACA and DOES 1-5, inclusive, and each of them, committed clear and well-established violations of constitutional rights against Plaintiff O.C. within the course and scope of their employment as RCSD deputies and SENTINEL employees, under color of law.

148.   The training of Defendants HEIDECKER, VACA and DOES 1-5, inclusive, by the

Defendants COUNTY, RCSD and SENTINEL did not adequately instill the necessary discipline, restraint, competence, and respect for civil rights required of armed law enforcement personnel and employees carrying out certain law enforcement functions. In particular, the training of Defendants HEIDECKER, VACA and DOES 1-5, inclusive, in terms of communicating with RASP participants and sexual abuse relative to RASP participants was in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and was manifestly inadequate.

149.    The critical need for discipline, restraint, and competence on the part of law enforcement and employees carrying out law enforcement functions was and is, or reasonably should have been, well-known to the Defendants COUNTY, RCSD and SENTINEL well before the rights of O.C. were violated.

150.    In fact, Defendants COUNTY, RCSD and SENTINEL failed to train its employees in the following regard:

a.    Permitting sheriff deputies, including HEIDECKER, to contact RASP participants while on duty for non-law enforcement purposes;

b.    Permitting sheriff deputies, including HEIDECKER, to sexually groom RASP participants;

c.    Permitting sheriff deputies, including HEIDECKER, to sexually prey upon RASP participants;

d.    Permitting sheriff deputies, including HEIDECKER, to sexually exploit RASP participants;

e.    Permitting sheriff deputies, including HEIDECKER, to take advantage of RASP participants for sexual purposes;

f.    Permitting male sheriff deputies, including HEIDECKER, oversee female RASP participants;

g.    Permitting sheriff deputies, including HEIDECKER, use their personal cell phones to communicate with RASP participants;

h.    Permitting sheriff deputies, including HEIDECKER, to engage in sexually improper conduct while on duty such as making a video entitled "Big Dick

COMPLAINT FOR DAMAGES
30

Deputies";

  i. Carrying out "cover ups" or plans to conceal misconduct by sheriff deputies, including the misconduct of HEIDECKER;

  j. Encouraging and ratifying cover ups by members of the professional standards bureau, including Defendant JESSICA YELENICH;

  k. Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to pay sexual abuse victims "hush money" or insulting and demeaning sums of money in exchange for their silence concerning sheriff deputy misconduct;

  l. Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to file tort claims on behalf of sexual misconduct.

  m. Permitting employees, including Defendant VACA, to ignore improper communications on SENTINEL cellular phones;

  n. Permitting employees, including Defendant VACA, to ignore sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

  o. Permitting employees, including Defendant VACA, to fail to report improper communications on SENTINEL cellular phones;

  p. Permitting employees, including Defendant VACA, to fail to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

  q. Permitting employees, including Defendant VACA, to have romantic relations with RCSD deputies; and

  r. Permitting employees, including Defendant VACA, to have sexual relations with RCSD deputies.

151. Therefore, despite the resounding need for improved or further training, both in general and with respect to Defendants HEIDECKER, VACA and DOES 1-5, inclusive,

Defendants COUNTY, RCSD and SENTINEL have allowed, if not encouraged, a culture of deliberate indifference to the rights and wellbeing of the public to develop within their respective work forces, thereby substantially causing the present Plaintiff, and countless others like her, to suffer extensive and irreversible violations of their civil rights, including but not limited to the freedom from unreasonable search and freedom to be free from unconscionable governmental action.

152. Clearly, Defendants COUNTY, RCSD and SENTINEL have shown a conscience-shocking level of deliberate indifference to the manifest, systemic consequences of the referenced training failures and other departmental impropriety of Defendants HEIDECKER, VACA and DOES 1-5, inclusive, inclusive, by which the present Plaintiff's civil rights were violated.

153. Accordingly, the training failures of the Defendants COUNTY, RCSD and SENTINEL are so inextricably connected to the unconstitutional conduct that Plaintiff has endured as to be a substantial moving force behind it. Therefore, the Defendants COUNTY, RCSD and SENTINEL must be regarded as similarly liable for all claims raised herein against its employees, agents, or representatives under 42 U.S.C. § 1983.

154. The vile sexual exploitation and abuse of Plaintiff O.C. suffered due to the conduct of Defendants HEIDECKER, VACA and DOES 1-5, inclusive, caused O.C. to have significant psychological injuries. As a direct consequence of these injuries, Plaintiff suffered and continues to suffer severe mental, and emotional anguish, as well as extensive hardship.

155. As a direct and proximate result of Defendants COUNTY, RCSD, SENTINEL's acts and/or omissions as set forth above, Plaintiff herein sustained injuries and damages.

156. Accordingly, Defendants COUNTY, RCSD, SENTINEL's failure to train its employees is so inextricably connected to the unconstitutional conduct that Plaintiff O.C. has endured as to be a substantial moving force behind it.

157. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

/ / /

/ / /

## SIXTH CLAIM FOR RELIEF

### Supervisory Liability

### (42 U.S.C. § 1983)

### Against Defendants SHERIFF BIANCO, JESSICA YELENICH and DOES 6 through 10

158.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

159.    At all material times, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 had the duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the other Defendants employed by their respective agencies in this matter, as well as all employees and agents of the COUNTY and RCSD.

160.    Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the respective employees of their agencies, including Defendant HEIDECKER and RCSD personnel, with deliberate indifference to Plaintiff and others' constitutional rights, which were thereby violated as described above.

161.    As supervisors, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights to safety and protections while under enrolled in RASP. Each of these supervising Defendants either directed his or her subordinates in conduct that violated O.C.'s rights, or set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive O.C. of rights, or knew his or her subordinates were engaging in acts likely to deprive O.C. of rights and failed to act to prevent his or her subordinate from engaging in such conduct, or disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate O.C. rights, and in fact did cause the violation of O.C. rights. (*See* Ninth Circuit Model Civil Jury Instruction 9.4). Furthermore, each of these supervising

Defendants is liable in their failures to intervene in their subordinates' apparent violations of O.C.'s rights.

162.    The unconstitutional actions and/or omissions of Defendants Deputy HEIDECKER and 1 through 10, and other COUNTY and RCSD personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and RCSD, including Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10.

163.    Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 and that such Defendant-policymakers have direct knowledge of the fact that Deputy HEIDECKER was sexually abusing and preying upon RASP participants, but continued to carry out their duties and responsibilities with deliberate indifference to O.C.'s rights to be protected from sexual abuse and conduct which shocked the conscious while a RASP participants as set forth above.

164.    Notwithstanding this knowledge, on information and belief, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 have approved and ratified of the conduct and decisions of Defendants Deputy HEIDECKER and DOES 1 through 5 in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the sexual harassment of O.C. By so doing, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.

165.    Furthermore, Plaintiff is informed and believes, and thereupon allege, that Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 and other policymaking officers for the COUNTY and RCSD were and are aware of a pattern of misconduct and injury, and a code of silence, caused by COUNTY and RCSD deputies similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the COUNTY

and RCSD.

166.    Defendants subjected O.C. to their wrongful conduct, depriving O.C. of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of O.C. and others would be violated by their acts and/or omissions.

167.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 as described above, Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees.

### SEVENTH CLAIM FOR RELIEF

**Negligence**

**Against All Defendants, Save SHERIFF BIANCO and JESSICA YELENICH**

168.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

169.    The present claim for relief is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant Deputy HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

170.    The present claim for relief is brought is also brought against Defendant VACA and by virtue of Defendant VACA's employment, Defendant SENTINEL as well.

171.    At all times, Defendants Deputy HEIDECKER, VACA and DOES 1-10 owed O.C. a duty to use reasonable care.

172.    These general duties of reasonable care and due care owed to O.C. by Defendant Deputy HEIDECKER include but are not limited to the following specific obligations:

a.    Contacting RASP participants while on duty for non-law enforcement purposes;

b.    Sexually grooming RASP participants;

c.    Sexually preying upon RASP participants;

d.    Sexually exploiting RASP participants;

e.    Taking advantage of RASP participants for sexual purposes;

f.    Improperly overseeing female RASP participants;

g.    Using personal cell phones to communicate with RASP participants;

h.    Engaging in sexually improper conduct while on duty such as making a video entitled "Big Dick Deputies"

173.    These general duties of reasonable care and due care owed to O.C. by Defendant VACA include but are not limited to the following specific obligations: Ignoring improper communications on SENTINEL cellular phones;

a.    Ignoring sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

b.    Failing to report improper communications on SENTINEL cellular phones;

c.    Failing to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

d.    Having a romantic relations with RCSD deputies; and

e.    Having a sexual relations with RCSD deputies.

174.    Defendants Deputy HEIDECKER, VACA and DOES 1-10 through their acts and omissions, breached each and every one of the aforementioned duties owed to O.C.

175.    As a direct and proximate result of these Defendants Deputy HEIDECKER, VACA's negligence, O.C. sustained injuries and damages.

176.    Defendants RCSD and COUNTY are vicariously liable for the violations of state law and conduct of their officers, employees, and agents, including individual named defendants, under California Government Code § 815.2.

177.    Defendant SENTINEL is liable for Defendant VACA's conduct under the doctrine

COMPLAINT FOR DAMAGES
36

of respondeat superior. See Perez v. Van Groningen & Sons, Inc. (1986) 41 Cal.3d 962, 967.

## EIGHTH CLAIM FOR RELIEF

### Violation of California Civil Code § 52.4

### (Gender Violence)

### Against Defendant COUNTY, RCSD, & HEIDECKER

178.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

179.    The present claim for relief is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

180.    As alleged herein, Defendant HEIDECKER sexually assaulted Plaintiff O.C. by intending to cause a harmful and offensive contact with O.C.'s intimate body parts. Further, Defendant HEIDECKER also caused an imminent fear of a harmful or offensive contact with O.C.'s intimate body parts. Clearly, Defendant HEIDECKER' intent was to cause a harmful or offensive contact with Plaintiff's body in a sexual manner.

181.    Pursuant to Civil Code § 52.4, for purposes of this section, "gender violence" is a form of sex discrimination and means either of the following:

        a.      (1) One or more acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

b.      (2) A physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

182.    On February 23, 2024 Defendant HEIDECKER plead guilty to multiple felonies for is sexual criminal conduct against RASP participants including O.C. and such conduct is gender violence within the meaning of Civil Code § 52.4 and was sentenced on March 7, 2024.

183.    Furthermore, Defendant HEIDECKER committed a physical intrusion or physical invasion sexual in nature as detailed herein. The conditions of such physical intrusion or physical invasion were coercive because Defendant HEIDECKER was a sheriff deputy wielding disproportionate power over RASP participants including O.C.. Such conduct is gender violence within the meaning of Civil Code § 52.4.

184.    As a direct and proximate result of Defendant HEIDECKER and DOES 1-10's conduct, O.C. sustained injuries and damages.

185.    The conduct of Defendant HEIDECKER entitles Plaintiff to punitive damages and penalties as provided by law. Plaintiff does not seek punitive damages against Defendants RCSD and COUNTY.

186.    Defendants RCSD and COUNTY are vicariously liable for the violations of state law and conduct of their officers, employees, and agents, including individual named defendants, under California Government Code § 815.2.

**NINTH CLAIM FOR RELIEF**

**Violation of Civil Code Section § 1708.88**

**Against Defendant COUNTY, RCSD, & HEIDECKER**

187.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

188.    The present claim for relief is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under §

815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

189.    In July of 2023 through August of 2023, Defendant HEIDECKER violated Civil Code Section § 1708.88 when he knowingly sent O.C. images, which he knew was unsolicited, by electronic means, depicting obscene material.

190.    As a direct and proximate result of Defendant HEIDECKER and DOES 1-10's conduct, O.C. sustained injuries and damages.

191.    The conduct of Defendant HEIDECKER entitles Plaintiff to punitive damages and penalties as provided by law. Plaintiff does not seek punitive damages against Defendants RCSD and COUNTY.

192.    Defendants RCSD and COUNTY are vicariously liable for the violations of state law and conduct of their officers, employees, and agents, including individual named defendants, under California Government Code § 815.2.

## TENTH CLAIM FOR RELIEF

### Violation of California Civil Code § 52.1

### (Tom Bane Act)

### Against All Defendants, Save SHERIFF BIANCO and JESSICA YELENICH

193.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

194.    The present claim for relief is brought pursuant to Civil Code Section 52.1 and Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed

COMPLAINT FOR DAMAGES
39

within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

195.    By their acts and omissions, Defendants HEIDECKER and VACA, through threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Plaintiff O.C.'s rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

a.    To be free from bodily harm pursuant to Cal. Civ. Code § 43;

b.    The right to be free from governmental interference as secured by the Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

c.    The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1.

196.    Defendant HEIDECKER's and VACA's violations of Plaintiff O.C.'s due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

197.    Alternatively, separate from, and above and beyond, Defendant HEIDECKER's attempted interference, interference with, and violation of Plaintiff O.C.'s rights as described above, Defendant violated Plaintiff O.C.'s rights by the following conduct constituting threat, intimidation, or coercion:

a.    Contacting RASP participants while on duty for non-law enforcement purposes;

b.    Sexually grooming RASP participants;

c.    Sexually preying upon RASP participants;

d.    Sexually exploiting RASP participants;

e.    Taking advantage of RASP participants for sexual purposes;

f.    Improperly overseeing female RASP participants;

g.    Using personal cell phones to communicate with RASP participants;

h.  Engaging in sexually improper conduct while on duty such as making a video entitled "Big Dick Deputies"

198.  Alternatively, separate from, and above and beyond, Defendant VACA's attempted interference, interference with, and violation of Plaintiff O.C.'s rights as described above, Defendant violated Plaintiff O.C.'s rights by the following conduct constituting threat, intimidation, or coercion:

a.  Ignoring improper communications on SENTINEL cellular phones;

b.  Ignoring sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

c.  Failing to report improper communications on SENTINEL cellular phones;

d.  Failing to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

e.  Having a romantic relations with RCSD deputies; and

f.  Having a sexual relations with RCSD deputies.

199.  Further, all of Defendant's violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

200.  Further, Defendants HEIDECKER and VACA violated Plaintiff's rights with reckless disregard and with the specific intent and purpose to deprive her of their enjoyment of those rights and of the interests protected by those rights.

201.  As a direct and proximate result of these Defendants HEIDECKER, VACA and DOES 1-10's conduct, O.C. sustained injuries and damages.

202.  As a direct and proximate result of Defendants HEIDECKER's and VACA's violation of California Civil Code § 52.1 and of Plaintiff's rights under the Civil Code, United States and California Constitutions, Plaintiff sustained injuries and damages, and against each and every Defendant is entitled to relief, including punitive damages against all individual Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to a multiplier of damages including treble damages, costs attorneys' fees, and civil penalties.

203.   Defendant SENTINEL is liable for Defendant VACA's conduct under the doctrine of respondeat superior. *See Perez v. Van Groningen & Sons ,Inc.* (1986) 41 Cal.3d 962, 967.

**VII.**

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment as follows:

A.   For economic and non-economic damages including but not limited to Plaintiff's physical, mental, and emotional pain and suffering, as well as all past, present, and future related medical expenses, in an amount according to proof at trial;

B.   For a multiplier of damages, including treble damages, as authorized under both Cal. Civ. Code § 52 and § 52.1;

C.   For civil penalties in the amount of $25,000 as authorized under both Cal. Civ. Code § 52 and§ 52.1;

D.   Damages and penalties pursuant to Civil Code Section § 1708.88;

E.   For punitive damages against the individual defendants in an amount to be proven at trial;

F.   For the reasonable attorneys' fees and costs allowed under 42 U.S.C. § 1988 and/or § 52 and § 52.1 in an amount to be proven at trial;

G.   For all other damages allowed under state and federal law, and;

H.   For such further relief as the Court may deem appropriate, proper, and just.

DATED:  June 27, 2024

LAW OFFICES OF AARON L. TURNER, APC

By: _____/s/ Aaron L. Turner_____
   AARON L. TURNER
   Attorneys for Plaintiff O.C., an individual

COMPLAINT FOR DAMAGES
42